UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD BISHOP, *on behalf of himself and all others similarly situated,*<br><br>                                Plaintiff,<br><br>          -against-<br><br><br>INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES LOCAL 52,<br>                                Defendant. | Civil Action No: 25-cv-2907<br><br><br>**<u>COMPLAINT</u>**<br><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Ronald Bishop ("Bishop" or "Plaintiff"), on behalf of himself and all others similarly situated, by and through undersigned counsel,  complains against the above-captioned defendant, as follows:

### PRELIMINARY STATEMENT

*Membership has its privileges,* and this adage is especially true in the film and television production industry where entertainment giants such as Disney, Netflix and NBC Universal, and smaller lesser-known production companies, rely on the industry's powerful labor unions to staff their production teams.  Union membership is key to obtaining consistent work in this field where the hiring practices for production crew members are opaque.  This action challenges a local union's wholesale, and  improper, denial of union membership to individuals legally entitled to membership, per the union's constitution and by-laws.  Plaintiff and the putative class members have, by the union's improper denial of membership, suffered significant losses in wages, job opportunities and benefits.

Plaintiff brings this action against  the defendant International Alliance of Theatrical Stage Employees Local 52 ("Local 52") for Local 52's  breach of contract under the Labor Management Relations Act ("LMRA"), Section 301, 29 U.S.C. § 185(a) *et seq.*,  and interference violations of

the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 and 1140.  Local 52 violated the vested membership provision, Article 7, Section 21, of the International Alliance of Theatrical Stage Employees ("IATSE") Constitution ("IATSE Constitution"), which provides for immediate vested membership after a non-member achieves vested status in the union's national employee defined benefit plan.   Per the IATSE Constitution, Mr. Bishop was entitled to immediate union membership as of June 30, 2018, but, even after that date, Local 52 refused Mr. Bishop's multiple membership applications until six years after he achieved vested status.   During this period, Local 52 arbitrarily admitted hundreds of other individuals  on the basis of nepotism and friendship, ahead of Mr. Bishop and putative class members.  Local 52 also freely offered membership to film and television production crew members on non-unionized productions, in order to "flip" the production to unionized status.   Local 52 had notice of Mr. Bishop's entitlement to membership, but consciously refused to abide by the IATSE Constitution, in order to restrict union membership benefits to only selected individuals.  Local 52 deprived, and interfered with, Mr. Bishop's, and putative class members, participation in the union's pension, health and benefits funds.  Mr. Bishop and putative class members were monetarily damaged by Local 52's refusing admission because Local 52 members work more frequently and consistently than non-members earn.

**PARTIES**

1.      Mr. Bishop is an African American male, and is domiciled in Kings County, State of New York.

1

2.      Defendant Local 52  is a labor organization, as defined by the National Labor Relations Act, and is the largest New York local of  IATSE, the self-styled *Union Behind Entertainment*. IATSE is a labor organization, as defined by the National Labor Relations Act.

3.      Local 52 is the bargaining unit for seven (7) different crafts, or job categories, in the film and television production industry: Electrical; Property; Grip; Medic; Shop Craft; Sound; and Video.

4.      Defendant Local 52 Benefit Trust Fund is an employee welfare benefit fund for Local 52 and is subject to ERISA.


## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 29 U.S.C. § 185(a).

6.       Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) as Local 52's principal place of business is located in Queens County and Mr. Bishop is a resident of Kings County, New York.


## RULE 23 CLASS ALLEGATIONS

7.      Plaintiff brings claims for relief pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on behalf of himself and all others similarly situated. The putative class comprises all Local 52 "permits" or "applicants" who achieved vested status, pursuant to the IATSE Constitution, Article 7, Section 21, but were not granted immediate Local 52 membership (the "Class").  The Class consists of  "permits" or "applicants" who discovered their vested status

on or after the date that is six years before the filing of the Complaint ("Class Period") in this action.

8.    For purposes of notice, the Class members' names and addresses are easily ascertainable from Defendant's records.

9.    The proposed Class is sufficiently numerous to make jointer of all parties impracticable, and, upon information and belief, is not less than three hundred (300) individuals.

10.    Plaintiff's claims arise out of the same set of Defendant's policies and practices of the Class members.

11.    Plaintiffs are able to fairly and adequately represent the interest of all Class members and is represented by counsel experienced in class and collective actions.

## FACTUAL ALLEGATIONS

### Mr. Bishop's Work and Membership Application History

12.    Film and television production provides thousands of consistent and well-paying jobs in this district, and in the larger New York City metropolitan area.

13.    The process to access job opportunities in the film and television production industry is opaque.  The industry's employers, both large and small production companies,  do not publicly post open production crew job opportunities.

14.    Projects are staffed by the respective department heads who choose the members of their respective teams.  For example, the Electric Craft Department is headed by a gaffer, who recruits from his or her own network, or calls Local 52 to refer qualified electric technicians.

15.    Mr. Bishop first applied to join Local 52 in late 2012.  At that time, he failed his first admissions process, which included a written test and practical skills test to join the union.

16.     At the time, Local 52 informed Mr. Bishop that he did not have the requirements for membership, denied his application and kept his application fee and processing fee.

17.     Mr. Bishop was then allowed to work for Local 52 represented productions as an "applicant," a status he would hold for 12 years while attempting to qualify for Local 52 membership.

18.     Individuals working on Local 52 represented productions fall into three union membership categories: members; applicants; and permits.

19.     Members are those formally inducted into Local 52.  Applicants are those who have formally applied to the union but have failed to gain membership.  And permits are those who are neither members or applicants but are nevertheless referred for work by Local 52.

20.     Local 52 members work more consistently than applicants and permits, have opportunities for advancement, and are eligible for the Local 52 pension plan, unlike applicants and permits.

21.     Mr. Bishop began his career as an electrical technician on film and television productions with production company Vienna's Dream Productions, Inc. on March 24, 2013, where, on that project, he earned 12.7 production hours.

22.     Mr. Bishop again applied for Local 52 membership in September 2015.  He failed to gain union membership because he allegedly again failed Local 52's examination and was denied membership a second time.

23.     In February 2017, Mr. Bishop again applied for and failed to gain Local 52 membership.

24.     Mr. Bishop again applied for, and was failed, in March 2019, March 2022, and May 2022.

4

25.     Mr. Bishop took the exam, once again, and was again failed in November 2022.  In January 2023, Local 52 emailed notice to Mr. Bishop that he failed the November 2022 exam.  As evidenced by the January 2023 notice, Mr. Bishop at no point in time, was ever given an opportunity to appeal any of the exams that he allegedly failed

26.     See a true and correct copy of Local 52's notice to Mr. Bishop attached hereto as **Exhibit** A.

27.     Each time Mr. Bishop applied for Local 52 membership, he was required to pay application and processing fees.

28.     Local 52's admission by examination process is, in reality, a sham. Local 52 admits individuals as members arbitrarily, with or without examination, depending on whether Local 52 wants or needs that individual to join.

29.     An example of this is Local 52's practice of "flipping" non-unionized productions. Especially on lower-budget productions, Local 52 grants membership, without examination, to crew members to expand its reach on unionized productions.

30.     Meanwhile, non-members who have filed applications and paid fees are denied membership despite legal entitlement.


IATSE Constitution and Local 52 Membership

31.     A Motion Picture Industry ("MPI") account that tracks production hours worked on each production is created for each worker, whether or not they are union members.

32.     The number of production hours an applicant, permit, or member earns on each production is very important, because production hours determine benefit levels within the union's health, benefits and pension plans.

33.    Production hours and length of time a worker contributes money to the union's benefits plans are even more important in terms of gaining membership to Local 52.

34.    Per the IATSE Constitution, any individual who vests into the union's national defined benefit plan automatically vests that individual with union membership.

35.    An individual vests into the union's national defined benefit plan after five (5) years of making contributions.

36.    Local 52 adopted the latest IATSE constitution on July 29, 2021.  Local 52's adoption of the constitution created a binding contract between IATSE and local 52.

37.    See a true and correct copy of the IATSE Constitution attached hereto as **Exhibit B.**


<u>Local 52 Refuses Mr. Bishop Membership After Vesting</u>

38.    Article 7, Section 21 of I.A.T.S.E. Constitution states: "**Any person who has achieved vested status in a Local or national defined benefit pension plan shall immediately be taken into membership without vote.**"

39.    Mr. Bishop vested into the MPIPHP defined benefit pension plan in June 2018. Therefore, at that time, Mr. Bishop should have been immediately taken into the membership, or as colloquially stated, made a "cardholder."

40.    Local 52 blatantly ignored its own Constitution and failed to offer Mr. Bishop immediate membership into the union.

41.    See a true and correct copy of the September 18, 2024, MPI letter to Mr. Bishop confirmed his vested date as June 30, 2018, attached hereto as **Exhibit C**.

6

42.    Incredibly, Mr. Bishop was required to go through several more admissions cycles, even after being vested into the MPIPHP.

43.    For example, in October 2022, Mr. Bishop was required to take a written exam and a practical skills test in order to qualify for Local 52 membership.

44.    On Sunday, January 29, 2023, Mr. Bishop was informed by email from the Local 52 HR Director that he had filled the electric department craft examination, which again denied him membership to the union.  The email further stated that Mr. Bishop could apply on the still unscheduled next admission cycle, whenever that would take place.

45.    The email did not state on what basis Mr. Bishop failed the examination.  The written and the practical skills portions of the examination are administered by an individual in Local 52's electric department and not by a neutral party.

46.    During this time, Local 52 was fully aware of the vesting provision in the IATSE Constitution but chose to ignore this provision in order to exclude unwanted members.

47.    On April 26, 2024, Mr. Bishop received an unsolicited email from Local 52 with the subject line: "*Local 52 Vested Electric Invitation,*" informing him that he was now being offered Local 52 membership based on Article 7, Section 21 of the IATSE Constitution.

48.    See a true and correct copy of the April 26, 2024, vested status email from Local 52 attached hereto as **Exhibit D.**

49.    Mr. Bishop was stunned. April 26, 2024, was the day Mr. Bishop learned of the vested status provision in the IATSE Constitution.  The email from Local 52 begged the questions: when was he entitled to vested membership, and why was he informed of this now?

50.    See a true and correct copy of the April 26, 2024, vested status invitation email attached hereto as **Exhibit D.**

51.     The April 26, 2024, email caused Mr. Bishop to reach out to MPI to inquire on the nature of his vested status notification from Local 52.

52.     MPI could only confirm that Mr. Bishop had accrued 11 Qualified Years and was vested as of June 30, 2018.

53.     Mr. Bishop still does not know why or how Local 52 made the decision to invite him for membership in 2024.

54.     There are no checks and balances to determine whether or not the practical skills portion of the examination is being administered in a consistent and equal basis.

55.     Over the past decade, Mr. Bishop gained the experience and skill he allegedly previously lacked, while working on productions, such as Daredevil and Blue Bloods, however his admission to Local 52 remained closed from June 30, 2018, to September 2024.

56.     Despite his experience, Mr. Bishop was not treated equally with cardholders while working on  productions.

57.     For example, as an applicant, Mr. Bishop was restricted from supervisory roles on productions and looked on while much less experienced technicians were promoted ahead of him, earning higher pay and status on the job.

58.     These restrictions caused Mr. Bishop financial harm and emotional distress for the years he was improperly blocked from union membership.

59.     Local 52's workforce is separated into several different categories, or statuses, correlated to the individual's membership status.  At the top of the food chain are the actual members of Local 52 or "cardholders." Next, there are the "applicants," individuals who have applied for Local 52 membership, but, for varying reasons, have been denied membership.  The

next category of workers are the "permits," individuals who have yet to apply for membership to Local 52 or have refused to apply to the union.

60.     Cardholders are Local 52's first class citizens.  Many of the advantages, privileges and benefits of being a cardholder,  as opposed to the lesser union statuses cause them to earn higher wages and benefits.

61.     Cardholders are the first hired and last fired on productions and are able to take days off from productions with the right to return to work.  Cardholders can bump, or replace, non-cardholders from productions when cardholders need work.


New York Attorney General Finds Racially Discriminatory Admissions Policies

62.     Local 52 has a long and sordid history of violating federal and state employment laws.  In August 2012, after receiving complaints, the Office of the Attorney General of the State of New York ("NYOAG"), Civil Rights Bureau, opened an investigation into Local 52's membership admissions policies to determine whether  the union discriminated against qualified African American and Latino applicants by failing to provide equal opportunity for admission to Local 52 membership.

63.     The NYOAG's investigation lasted for approximately two years, from August 2012 to September 2014.  The NYOAG investigation was thorough; it included reviewing Local 52's internal documents, taking sworn testimony of Local 52 Executive Board members, data analyses, and conducting interviews with complainants.

64.     The NYOAG investigation found significant disparities between, on the one hand, lack of African American and Latino representation in the union membership, and on the other hand, the representation of these minority groups in the metropolitan area labor pool.

65.   The NYOAG investigation concluded that Local 52's discriminatory admissions practices had a disparate impact on African American and Latino applicants.

66.   The NYOAG also found that union members obtained **significantly more** film and television production jobs, and on a more consistent basis, than applicants and permits.

67.   Each admissions cycle, Local 52 administers examinations, consisting of a written test and a practical skills demonstration to union membership hopefuls.

68.   On September 24, 2014, Local 52 and the NYOAG entered into a settlement agreement called an Assurance of Discontinuance ("AOD"), to resolve the NYOAG's potential claims against the union for race discrimination.

69.   Local 52 agreed to pay a monetary penalty of $475,000 and agreed to an extensive set of structural remedies aimed at ensuring equal opportunity for union membership for all.

70.   The structural remedies included changes to Local 52's application procedures that had a disparate impact on African American and Latino applicants.

71.   Local 52 agreed to ensure that the design of its application procedures allowed for applicants to be evaluated on their qualifications and abilities in a consistent and non-discriminatory manner that does not favor the family and friends of Local 52 members.

72.   On September 6, 2016, the NYOAG and Local 52 signed an Addendum, or extension, to the AOD.

73.   The Addendum stipulated continued monitoring and structural changes to the union's admissions process in order to ensure equal opportunity for all applicants.

74.   The NYOAG also examined the issue of Article 7, Section 21 vested membership status.

75.    The NYOAG recognized that certain applicants and permits who had already achieved vested status per the IATSE Constitution continued to be blocked from Local 52 membership.

76.    The NYOAG raised the issue with Local 52, and Local 52 assured the NYOAG that they complied with the IATSE Constitution vested membership provision.

77.    However, that was not the case then, and today it's still not the case.  There are hundreds of applicants and permits who should be or should have been automatically vested, but have been blocked.

## Harker NLRB Complaints Against Local 52

78.    On January 10, 2022, James Harker ("Harker"), a Local 52 member, filed with the National Labor Relations Board ("NLRB"), a Charge of Unfair Labor Practices ("ULP") against Local 52 alleging, *inter alia,* that the union and certain film studio employers are also discriminated against applicants, as opposed to Local 52 members, in its hiring practices.

79.    See a true and correct copy of the Harker ULP Charge attached hereto as **Exhibit E.**

80.    The specific unfair labor practices engaged by Local 52 and the studio employers are:

- o Local 52's prior approval for work assignments;

- o Local 52 members with hiring authority must first exhaust all possible members before hiring a non-member;

- o Local 52's members with hiring authority may not hire nonmember "permits" or "applicants" without the Union's approval;

- o  Defendant's members with hiring authority must exhaust all possible members before hiring nonmembers through the Union;

- o  Employers covered by Defendant's collective-bargaining agreements may not hire nonmember "permits" or "applicants" without Defendant's prior approval; and

- o  if a member of Defendant is available to work, the member may "bump" a nonmember "permit" or "applicant" off an employer's production because of the nonmembers lack of membership with Defendant.

81.    Harker's ULP complaint charged employer studios with assisting Local 52's illegal practices through the actions of studio employer hiring managers, who are members of Local 52, engaging in secret practices that illegally restricted employment opportunities for union nonmembers.

82.    For example, on or about October 24, 2021, a union official, in a general membership meeting, threatened to discipline union members with hiring authority who hired nonmembers without the union's prior approval.

83.    The studios' hiring authority for the union-represented crafts is vested in hiring managers who are Local 52 members and have tacitly agreed to follow the same practices outlined above.

84.    The unwritten hiring rules described in Paragraph 73 that improperly favored Local 52 members further restricted equal hiring opportunities for non-union members in the film and television production industry ranks.

### Local 52 Employee Benefit Plans

85.     Local 52 members working under the Local 52 collective bargaining agreement ("CBA") are entitled to participate in three (3) separate employee benefit plans: the Motion Picture Industry Pension Plan and Individual Account Plan ("MPI Plan"); the IATSE National Benefit Fund ("IATSE Plan"), and the Local 52 Benefit Trust Fund ("Local 52 Plan").  The foregoing plans are subject to the Employee Retirement Income Security Act of 1974  ("ERISA"), 29 U.S.C. § 1001 *et seq.*

86.     Applicants and permits contribute to the employee benefit plans through 2.5% gross wage deductions but are only eligible to participate in the MPI Plan and IATSE Plan.

87.     Applicants and permits also indirectly contribute to the Local 52 Plan through fees paid to Local 52 l, which in turn directly funds the Local 52 Plan.

88.     Local 52's conscious refusal to timely admit Mr. Bishop and the putative class members upon their vested status, as required by the IATSE Constitution, Article 7, Section 21, caused them monetary harm because pension and other benefits levels are directly correlated to the length of time and number of production hours worked by each participant; and, statistically, Local 52 members work more production hours than non-members.

89.     For example, eligibility requirements and benefits levels for the Local 52 Plan are dependent upon the length of time an individual has been a Local 52 member and the number of hours previously worked.

90.     See a true and correct copy of the Local 52 Benefit Trust Fund Plan Summary attached hereto as **Exhibit F**.

91.     Local 52 members are eligible for benefits under the Local 52 Plan benefits that supplement the benefits granted under the MPI Plan and IATSE Plan.

92.    Local 52 applicants and permits who have vested under Article 7, Section 21 of the IATSE Constitution, and mot immediately made members of Local 52, are deprived of the right to participate in the Local 52 Plan.

93.    The Local 52 Plan is exclusively for Local 52 members.  Applicants and permits are not eligible for the Local Plan benefits, nor can they accrue time as non-members.

## CAUSES OF ACTION

### FIRST  CAUSE OF ACTION
(LMRA § 301-Breach of Contract)

94.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

95.    The IATSE Constitution is a binding contract between IATSE and Local 52.

96.    Local 52 breached the terms of the IATSE Constitution, pursuant to LMRA § 301, by failing to immediately take into membership Plaintiff and putative class members into Local 52 membership after they qualified for automatic vested membership, as outlined in the IATSE Constitution, Article 7, Section 2.

Plaintiff and putative class members suffered significant monetary damages as a result of Local 52's breach because Local 52 members work on a more consistent basis than non-members.

### SECOND CAUSE OF ACTION
(Interference-Violation of ERISA § 510)

97.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

98.    Local 52 violated Section 510 of ERISA by interfering with Mr. Bishop's attainment of benefits of the MPI Plan, IATSE Plan and the Local 52 Plan.

99.    At all times relevant to this action, Mr. Bishop was a participant in all the aforementioned employee benefits plans

100.    Local 52 specifically intended to deprive Mr. Bishop and putative class members of the union's benefits because the union was given notice that Mr. Bishop and putative class members were entitled to vested status membership.

### THIRD CAUSE OF ACTION
(Violation of ERISA § 502)

101.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

102.    At all times relevant to this action, Mr. Bishop was a participant, as defined by the National Labor Relations Act, in all of the forgoing Local 52 employee benefit

103.    Mr. Bishop may recover for lost benefits under Section 502 of ERISA because Local 52 interfered with his participation in the employee benefit plans.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests from this Court a judgment:

a) Declaring that Defendant Local 52 violated Article 7, Section 21 of the IATSE Constitution by failing to immediately admit Mr. Bishop into Local 52 membership after he was vested, pursue it to the terms of the IATSE Constitution.

b) Granting permanent injunctive relief is-a-vis Local 52's vested applicant admissions process.

c) An order certifying a class of plaintiffs pursuant to F.R.C.P. 23;

d) An award of compensatory and consequential damages for Local 52's violation of Article 7, Section 21 of the IATSE Constitution;

e) An award of monetary damages under ERISA;

f) An order for equitable relief under ERISA;

g) An award of reasonable attorneys' fees':

h) All such other and further relief as this Court deems just and  proper

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: New York, New York
      May 27, 2025


            CHARLES LAW, P.C.

            <u>/s/ Fred V. charles</u>
            Fred V. Charles, Esq.
            244 Fifth Ave., Suite#2717
            New York, NY 100001
            Telephone: (646) 494-2662
            Email: fcharles@charleslawpc.com